**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RALPH BLAINE SMITH,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:22-cv-00045** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **DAVID SILVERNAIL,** *et al.*, | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **Defendants.** | : | |

**OPINION & ORDER**

This matter is before the Court on Defendants Fairfield County, Ohio, and Gregg Marx's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 24). For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED IN PART and DENIED IN PART**.

## I.  BACKGROUND

### A.  Factual Background

In 2000, Plaintiff Ralph Blaine Smith was convicted by a jury of two counts of aggravated robbery, two counts of kidnapping, and one count of theft. (ECF No. 15 ¶ 41). For these crimes, he was sentenced to prison for 67 years. (*Id.*). That conviction was later vacated, but not before Smith had already spent 21 years in prison. (*Id.* ¶ 1). Smith now brings suit against David Silvernail, Greg Marx, the City of Pickerington, and Fairfield County, Ohio, seeking redress for the misconduct that led to his wrongful imprisonment. (*See id.* ¶¶ 5–12).

The alleged robbery occurred on the night of February 2, 2000. (*Id.* ¶ 13). According to Rudolph Valentino ("Rudy") Stefanitsis during the 911 call, the Stefanitsises heard a knock at the front door of their residence at 332 Colony Park Drive, Pickerington, Ohio, around 10:30 p.m. (*Id.*

1

¶ 14).  When they answered the door, two masked individuals barged into the house and stole more than $11,000 in cash, more than $4,000 worth of comic books, and around $6,500 in jewelry from the family safe and bedrooms.  (*Id.* ¶¶ 14–16).  The robbers then bound Rudy, Trisha, and their children with tape, and left with the stolen goods.  (*Id.* ¶ 16).  Once the Stefanitsises freed themselves from the tape, they reported the incident to the police.  (*Id.* ¶ 17).

Defendant David Silvernail ("Detective Silvernail"), a detective with the City of Pickerington Police Department, assumed control of the investigation.  (*Id.* ¶ 20).  He first interviewed the Stefanitsises on February 3 and 4.  (*Id.* ¶ 24).  Initially, Rudy and Trisha Stefanitsis were unable to provide detailed descriptions of the robbers.  (*Id.*).  Instead, the Stefanitsises had two theories: Rudy thought that a man named Dana Rowe might be the culprit, while Trisha focused on a black Geo Tracker automobile with green lettering, which she believed to be the vehicle driven by the robbers.  (*Id.* ¶¶ 24, 26, 28).  Detective Silvernail did not, however, investigate these leads, instead preferring to believe statements from Mary Office, a friend of the Stefanitsises, that Plaintiff was involved in the robbery.  (*Id.* ¶¶ 23, 27).  Defendant Gregg Marx ("Marx"), who was serving at the time as the Assistant Prosecuting Attorney for Fairfield County, also paid a visit to the Stefanitsises on March 6, 2000.  (*Id.* ¶ 34).  After that visit, Plaintiff was charged with kidnapping, armed robbery, and theft.  (*Id.* ¶ 35).  In support of that indictment, Marx called upon the Stefanitsises to testify before the grand jury identifying Plaintiff as one of the two robbers.  (*Id.*).  Marx served as the prosecutor during Plaintiff's trial, which turned entirely on the Stefanitsises' "eyewitness" identification.  (*Id.* ¶¶ 37, 39).  The prosecution did not provide further evidence of Plaintiff's guilt, such as fingerprint evidence, DNA evidence, or cell phone location data.  (*Id.* ¶ 37).

2

Plaintiff contends that the prosecution hid exculpatory evidence, which would have supported one of two alternative theories about the alleged robbery. First, Plaintiff suggests that there was evidence that the robbery did not happen at all, but was instead part of a fraudulent scheme devised by the Stefanitsises to escape financial difficulties that they faced at the time. (*Id.* ¶ 32). In support of this theory, he notes that the police officers who responded to the Stefanitsis home on the night of the alleged robbery did not find any footprints or tire tracks in the fresh snow and observed the interior of the home to be largely undisturbed. (*Id.* ¶¶ 19, 43 (detailing Officer Annis's "overt skepticism that any crime occurred")). During Detective Silvernail's interview with Trisha Stefanitsis, she had difficulty providing consistent descriptions of the robbers. (*Id.* ¶ 45). Moreover, the Stefanitsises' neighbors did not notice any unusual cars in the driveway or hear any unusual noises, and their dogs did not bark in alarm on the night of the alleged robbery until the police arrived. (*Id.* ¶¶ 44(e), (f)). Other evidence supported a second theory: namely that Rowe was the real culprit of the home invasion and robbery. Rudy had hypothesized that the robbers must have known about the safe, given the sequence of their actions, and Rowe was among Rudy's list of individuals with that knowledge. (*Id.* ¶ 21). Rudy further told Detective Silvernail that he was confident Rowe was involved in the robbery, but that "it doesn't [sic] make sense" to focus on Plaintiff as a suspect. (*Id.* ¶¶ 29, 49). Finally, Rowe was friends with Mary Office, who had given Plaintiff's name to Detective Silvernail and with whom Plaintiff had recently broken up; Office, in other words, had motive both to protect her friend Rowe and to impugn Plaintiff. (*Id.* ¶¶ 22, 31, 44(a)).

Whatever the real story behind the incident on February 2, 2000, may be, the above-mentioned exculpatory evidence was withheld from Plaintiff before and during his trial. (*Id.* ¶ 44). Moreover, Marx then elicited false and misleading testimony from Detective Silvernail at trial —

3

in particular, prompting Detective Silvernail to state that no witness had suggested any alternative culprits and that the Stefanitsises had consistently named Plaintiff as the culprit, when, in truth, the Stefanitsises had previously suggested Rowe as the culprit and had been slow to identify Plaintiff at all.  (*Id.* ¶¶ 40, 50, 52, 53).  As a result of Detective Silvernail's misleading testimony and Marx's withholding of exculpatory evidence, Plaintiff spent over two decades in prison before being released in 2021.

## B.  Procedural Background

Plaintiff filed the complaint in this action on January 7, 2022.  (ECF No. 1).  In response, Defendants Fairfield County and Marx (collectively, the "Fairfield County Defendants") submitted a Motion to Dismiss (ECF No. 9), which was denied as moot after Plaintiff filed an Amended Complaint (ECF No. 15) on March 26, 2022.  (ECF No. 20).  Subsequently, the Fairfield County Defendants renewed their Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 24).  That motion is now ripe for this Court's review.

## II.  STANDARD OF REVIEW

The Fairfield County Defendants move to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure Rule 12(b)(6).

## A.  Subject Matter Jurisdiction

Before determining whether a plaintiff has stated a claim upon which relief may be granted, this Court must first decide whether it has subject matter jurisdiction.  *City of Heath v. Ashland Oil, Inc.*, 834 F. Supp. 971, 975 (S.D. Ohio 1993) (citing *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1900)).  Subject matter jurisdiction is, fundamentally, about the court's authority over the parties and the action before it.  Where a defendant seeks to challenge

the factual existence of subject matter jurisdiction, "no presumptive truthfulness applies to the factual allegations" in the complaint, *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990), and "the district court must therefore weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." *Id*. In such cases, the plaintiff bears the burden of proving that the court has jurisdiction over the subject matter. *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005) (citing *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004)).

Pursuant to the Eleventh Amendment, courts lack subject matter jurisdiction to hear cases brought by private citizens against a State, except where the State has explicitly consented to the suit or Congress has demonstrated its intent to abrogate state immunity. *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990) (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985)). Abrogation must be pursuant to a valid exercise of power, such as when Congress has promulgated legislation under Section 5 of the Fourteenth Amendment. *See Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976). It does not, however, apply to suits brought against a state under 42 U.S.C. § 1983 "because [that] statute only creates a cause of action against a 'person' who causes the deprivation of another's Constitutional rights." *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 654 n.8 (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

### B. Failure to State a Claim

A motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual

allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). Accordingly, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)). Although the court's primary focus will be on the allegations in the complaint, the court may also consider "any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

To survive a motion to dismiss, "the plaintiff must allege facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level and to state a claim to relief that is plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (internal quotations omitted) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And though the court "must accept all well-pleaded factual allegations in the complaint as true," the court "need not accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

### III.    LAW & ANALYSIS

In total, Plaintiff alleges nine causes of actions against Defendants (including for attorneys' fees). As it pertains to the motion to dismiss pending before this Court, Plaintiff has alleged that Defendant Marx has committed malicious prosecution (Count 2), conspiracy in violation of 42

6

U.S.C. §§ 1983, 1985 (Count 4), wrongful conviction (Count 5), and false imprisonment (Count 6). He further alleges that Defendant Fairfield County is liable for the *Brady* violations of Defendant Marx and for inadequate training and supervision of its prosecutors (Count 8). The Fairfield County Defendants counter that Plaintiff's claims are barred by the Eleventh Amendment and absolute prosecutorial immunity, and fail to state a viable *Monell* claim for municipal liability. (ECF No. 24 at 1).

### A. Official Capacity Claims against Defendant Marx

This Court first considers the Fairfield County Defendant's arguments that Plaintiff's claims against Defendant Marx are barred by the Eleventh Amendment. In Plaintiff's Reply Brief (ECF No. 27), Plaintiff effectively abandons these claims, stating that "his official capacity claim against Marx . . . is subject to dismissal." (*Id.* at 11).

It is well-settled that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and "[a]s such . . . is no different from a suit against the State itself." *Will*, 491 U.S. at 71 (internal citations omitted). The line separating when an entity (or an official) "should be treated as 'an arm of the State' rather than as a municipal corporation 'depends, at least in part, upon the nature of the entity created by state law.'" *Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). Pursuant to state law in Ohio, a city or county prosecutor is considered an arm of the state when she "pursues her duties as a state agent when enforcing state law or policy" — that is, when she prosecutes state criminal charges. *Pusey v. City of Youngstown*, 11 F.3d 652, 657–58 (6th Cir. 1993) (citing Ohio Rev. Code §§ 1901.34(C), 309.08). Here, Plaintiff seeks to hold Marx liable for his actions as a county prosecutor enforcing state criminal laws or, in other words, for his actions as a state official. *See id.* And because an

action against a state official is effectively a claim against the State, which is barred by the Eleventh Amendment, such actions (including Plaintiff's claims against Marx under 42 U.S.C. § 1983) are also barred by the same Eleventh Amendment immunity.  *See Brown v. Strickland*, 2010 WL 2629878, at *3 (S.D. Ohio June 28, 2010) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Quern v. Jordan*, 440 U.S. 332, 334 (1979)).

Of course, the Supreme Court has carved out an exception to Eleventh Amendment immunity in cases where state officials have been sued in their official capacities for injunctive relief.  *See Ex parte Young*, 209 U.S. 123 (1908).  But that exception applies only in cases seeking "prospective relief to end a continuing violation of federal law."  *Carten v. Kent State Univ.*, 282 F.3d 391, 395 (6th Cir. 2002).  It does not apply, on the other hand, in cases involving retroactive relief, *see Edelman v. Jordan*, 415 U.S. 651, 678 (1974), monetary damages from the state treasury, *see id.* at 663, or violations of state law, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104–06 (1984).  But here, Plaintiff's claims against Defendant Marx seeks precisely what is not allowed: monetary damages from the state for past conduct.  Accordingly, Plaintiff's official-capacity claims against Defendant Marx are **DISMISSED**.

### B.    Individual Capacity Claims against Defendant Marx

Defendant Marx argues that Plaintiff's individual-capacity claims against him should also be dismissed because Plaintiff has failed to state an actionable claim.  (ECF No. 24 at 8). Specifically, Marx suggests that he is shielded by absolute prosecutorial immunity.  (*Id.* at 9). Plaintiff, however, disputes the applicability of prosecutorial immunity, arguing that Marx acted as an investigator rather than a prosecutor when he met with the Stefanitsises at their home on March 6, 2000.  (ECF No. 27 at 13).  That meeting was conducted before probable cause existed,

according to Plaintiff; Marx's intent was to influence improperly Rudy and Trisha and thereby establish probable cause.  (*Id.* at 15–16).

In general, prosecutors are shielded from liability under § 1983 for actions within the scope of their prosecutorial duties.  *Imbler v. Pachtman*, 424 U.S. 409, 424–29 (1976).  To determine whether absolute prosecutorial immunity applies, courts use a "functional approach" that entails "look[ing] to 'the nature of the function performed, not the identity of the actor who performed it.'"  *Cooper v. Parrish*, 203 F.3d 937, 947 (6th Cir. 2000) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)).  The functional approach "focuses on whether the prosecutor's activities are 'intimately associated with the judicial phase of the criminal process.'"  *Id.* (quoting *Imbler*, 424 U.S. at 430).  Thus, purely prosecutorial activities are entitled to absolute immunity, but a prosecutor is not shielded when she carries out "investigatory functions normally performed by detectives or police officers such as searching for clues and corroboration to recommend that a suspect be arrested."  *Red Zone 12, LLC v. City of Columbus*, 2018 WL 1401069, at *4 (S.D. Ohio Mar. 20, 2018) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)).

As noted above, Plaintiff does not appear to dispute that the bulk of Defendant Marx's actions in prosecuting the case warrant immunity and focuses only on the March 6, 2000, visit with the Stefanitsises.  (*See* ECF No. 27 at 15 (noting only that "none of movant's case law examples of 'purely prosecutorial functions' . . . applies to plaintiff's claims [about] March 6th," but not disputing the applicability of the referenced case law to Marx's conduct during trial)).  That emphasis is sensible: Defendant Marx's alleged conduct in withholding evidence, prosecuting Plaintiff, eliciting false testimony, and conspiring with Defendant Silvernail to imprison falsely Plaintiff was, if true, inappropriate and deserving of reprimand but still squarely within the boundaries of traditional prosecutorial activities.  *See Spurlock v. Thompson*, 330 F.3d 791, 797–

98 (6th Cir. 2008); *Burns v. Reed*, 500 U.S. 478, 486 (1991) (interpreting *Imbler* to extend prosecutorial immunity to "the alleged knowing use of false testimony at trial and the alleged deliberate suppression of exculpatory evidence").

In reaching this conclusion, this Court is bound by higher court precedent. *See Reed*, 500 U.S. at 486; *Imbler*, 424 U.S. at 432 n.34 (rejecting any distinction between the "willful use by a prosecutor of perjured testimony and willful suppression by a prosecutor of exculpatory information" and thus arriving at the conclusion that absolute prosecutorial immunity must also apply to claims of suppression of evidence); *Koubriti v. Convertino*, 593 F.3d 459, 470 (6th Cir. 2010) ("*Jones* and *Imbler* make clear that absolute immunity protects a prosecutor from civil liability for the non-disclosure of material exculpatory evidence at trial."); *Jones v. Shankland*, 800 F.2d 77, 80 (6th Cir. 1986). But this Court is compelled to acknowledge the grim reality dictated by precedent: the extension of absolute immunity to prosecutors who have suppressed exculpatory evidence has made a mockery of the protections established in *Brady v. Maryland*, 373 U.S. 83 (1963). By protecting prosecutors even when they have committed *Brady* violations, the current § 1983 regime leaves a large class of innocent people who have been wrongfully convicted without any legal recompense. *Cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) ("[W]here there is a legal right, there is also a legal remedy by suit or action at law, whenever that law is invaded." (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES *23)); *see also* Brian M. Murray, Jon B. Gould & Paul Heaton, *Qualifying Prosecutorial Immunity Through* Brady *Claims*, 107 IOWA L. REV. 1107, 1111 (2022) (noting that prosecutorial immunity is unmoored from "the incentive-based forces that permeate the tort system, which are designed to promote safety, minimize near misses, and compensate wronged individuals"). As it stands, *Brady* violations are pervasive, *see* % Exonerations by Contributing Factor, NAT'L REGISTRY OF EXONERATIONS,

https://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.asp x (last updated Nov. 4, 2022), and yet also heavily under-reported. *See* Margaret Z. Johns, *Unsupportable and Unjustified: A Critique of Absolute Prosecutorial Immunity*, 80 FORDHAM L. REV. 509, 513–514 (2011). Of course, if a *Brady* violation, or other form of prosecutorial misconduct, leads to a wrongful conviction, there is a heavy cost not only to the innocent person now-imprisoned but also to society as a whole: the real wrongdoer gets off scot-free.

Writing for the Court in *Imbler*, Justice Powell suggested that prosecutors would be deterred from misconduct, despite being cloaked with immunity from § 1983 suits, by the threat of criminal suits pursuant to 18 U.S.C. § 242 and the potential of professional discipline by their peers. *Imbler*, 424 U.S. at 429. But the promise of deterrence has not held true. Prosecutors are rarely, if ever, disciplined for unethical behavior compromising the fairness of a trial. *See* Rachel E. Barkow, *Organizational Guidelines for the Prosecutor's Office*, 31 CARDOZO L. REV. 2089, 2095 (2010) (detailing a study that "found only nine cases in which a state bar even *considered* imposing discipline for *Brady* violations" across 41 states over five and a half years); Ken Armstrong & Maurice Possley, *The Verdict: Dishonor*, CHI. TRIB. (Jan. 10, 1999), https://www.chicagotribune.com/investigations/chi-020103trial1-story.html (reporting on 381 homicide cases, including 67 capital cases, that were reversed because of a failure to disclose exculpatory evidence, with no repercussions for all but a few of the prosecutors). Courts condemn blatant misconduct — labelling actions "unforgivable," "illegal," and "intolerable" — but harsh words do not deter, especially when disciplinary proceedings are rare, and do not provide much solace for those who were falsely imprisoned. Nor does the threat of criminal sanctions under § 242 carry any weight; only one prosecutor has ever been convicted under that statute since 1866, the year it was passed. *See* Richard A. Rosen, *Disciplinary Sanctions Against Prosecutors for*

11

Brady *Violations: A Paper Tiger*, 65 N.C. L. REV. 693, 703–04 n.56 (1986).  In short, we are left

with sham mechanisms for deterring misconduct that is constitutionally prohibited, difficult in the

first instance to uncover, has devastating effects on the lives of innocent people and their family,

and allows wrongdoers to walk free.[1]

 And so, according to precedent, Plaintiff has no remedy for spending 20 years in prison

due in part to Marx's alleged *Brady* violations; nor is there any deterrence against Marx, or any

other prosecutor, from suppressing exculpatory evidence in future cases.  The entirety of Plaintiff's

individual capacity claim against Defendant Marx must rest solely on his contention that Marx

acted as an investigator during the March 6, 2000, meeting.  Plaintiff suggests that the Stefanitsises

were unable to identify Plaintiff prior to that meeting based on their previous statements to

Detective Silvernail in early February.  Without an eyewitness identification by the Stefanitsises,

Marx lacked probable cause that Plaintiff committed the robbery.  (*See* ECF No. 27 at 14).  And

at that March meeting, Marx sought to do what Detective Silvernail had not: establish probable

cause by convincing the Stefanitsises to identify Plaintiff as one of the culprits.  (*See id.* at 15).

Based on the identification, Marx then charged Plaintiff.  By attempting to help the police establish

probable cause before it existed, Marx's actions during that meeting were investigatory and

therefore not shielded by prosecutorial immunity — or so the argument goes.

 These arguments do not stand up to careful scrutiny.  The Amended Complaint states

conclusively that Defendant Marx "personally investigated the Stefanitsis' robbery claims" but

fails to provide factual allegations supporting that conclusion.  Beyond the March meeting,

---

[1] Not to mention, *Imbler*'s invocation of trial and appellate courts as safeguards of fair trials in the face of prosecutorial misconduct has been eroded by the "harmless error" and "due diligence" doctrines.  *See* D. Brooks Smith, *Policing Prosecutors: What Role Can Appellate Courts Play?*, 38 HOFSTRA L. REV. 835, 839; Kate Weisburd, *Prosecutors Hide, Defendants Seek: The Erosion of* Brady *Through the Defendant Due Diligence Rule*, 60 ULCA L. REV. 138 (2012).

Plaintiff does not suggest that Marx pursued leads, interviewed possible suspects, gave legal advice to the police, or directed the police investigation.  And, with respect to his allegations about that visit, Plaintiff does not provide any factual allegations about what Marx said, what questions he asked during the alleged interrogation, or how he influenced the Stefanitsises.  (*See id.*).  Instead, Plaintiff relies on a speculative leap — that because the Stefanitsises initially had difficulty providing detailed descriptions of the robbers (and had suspicions about Dana Rowe) but identified Plaintiff as the robber a month later, the intervening home visit by Marx must have been the one and only factor that changed their minds.  (*See* ECF No. 15 ¶¶ 24, 28, 34–35).  That jump in logic ignores the many other possible explanations for the change.  In fact, one such explanation can be found within Plaintiff's own factual allegations, in which he states that Defendant Silvernail persuaded the Stefanitsises to identify Plaintiff as one of the robbers on February 10, 2000.  (ECF No. 15 ¶ 24).  Moreover, if the Stefanitsises had already identified Plaintiff as a suspect in early February, then probable cause was established by the time Marx visited the Rudy and Trisha a month later — undermining Plaintiff's claim that Marx's visit was investigatory because it was done without probable cause.  The Amended Complaint does not, by contrast, contain allegations that the Stefanitsises maintained their initial suspicions about Dana Rowe or their initial confusion until the March 6 meeting.  (*See generally id.*).

Because the Amended Complaint does not provide any specific factual allegations that Marx acted in an investigatory capacity beyond bare conclusions to that effect, he is entitled to absolute prosecutorial immunity.  Accordingly, Plaintiff's claims against Defendant Marx in his individual capacity are **DISMISSED**.

## C.    Claims against Defendant Fairfield County, Ohio

Finally, this Court considers Plaintiff's claims against Defendant Fairfield County.  The Eighth Count of the Amended Complaint asserts that Fairfield County is liable for Marx's violations of the requirements set out in *Brady v. Maryland*, 373 U.S. 83 (1963), and that the county maintained a policy of inadequate training of its prosecutors vis-à-vis compliance with *Brady*.  (ECF No. 15 ¶¶ 105–06).  But according to Fairfield County, the Amended Complaint fails to demonstrate that Marx's actions constitute a policy, custom, or practice of Fairfield County and, therefore, does not give rise to a *Monell* claim against the county.

In *Monell v. Dep't of Soc. Servs.*, the Supreme Court determined that a municipality may be held liable under § 1983 for the unconstitutional acts of its employees if a municipality's official policy or custom is the source of the injury.  436 U.S. 658, 694 (1978).  That official policy or custom must be the "moving force" behind the violation.  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (citing *Monell*, 436 U.S. at 694)).  Thus, to plead a claim for *Monell* liability, "a plaintiff must 'identify the policy [or custom], connect the policy to the [government entity] and show that the particular injury was incurred because of the execution of that policy.'"  *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)).  The existence of a municipal policy might be demonstrated, for example, by a single decision by a municipal policymaker, such as a legislative act or decision by an official with final authority, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–84 (1986), or an action by a municipal employee, even without final decision-making power, if it is part of a pattern or "at least implicitly authorized, approved, or knowingly acquiesced in" by a decisionmaker.  *King v. City of Eastpointe*, 86 F. App'x 790, 801 (6th Cir. 2003) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).  Here, it appears

14

that Plaintiff proposes four different theories for imposing *Monell* liability on Fairfield County: (1) the alleged *Brady* violations were undertaken by Marx, who Plaintiff asserts was the county's "chief policymaker with regard to all aspects of the criminal prosecution of plaintiff"; (2) Marx's actions were ratified by the Fairfield County Prosecutor David Landefeld; (3) the violations were the result of deliberate indifference; and (4) the violations were the product of a policy of inadequate training.

Whether a municipal employee has final decision-making authority is a question of state law. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). As Plaintiff acknowledges, Marx served as an Assistant Prosecuting Attorney during the period of time relevant to this action. (ECF No. 1 ¶ 10). As such, Marx was presumably not the final decision-maker for the Fairfield County Prosecutor, and Plaintiff has not alleged any specific facts to the contrary. But Plaintiff has alleged with specificity that Marx's actions were ratified by Landefeld, who was the Fairfield County Prosecutor at the time, *see Pembaur*, 475 U.S. at 484 (deferring to the Sixth Circuit's analysis that, pursuant to Ohio law, a "County Prosecutor could establish county policy under appropriate circumstances"), during the post-trial and appellate stages. (*See* ECF No. 15 ¶ 102). In response, Defendant Fairfield County asserts only that Marx was the county's chief policymaker and suggests that the Amended Complaint is self-contradictory,[2] but does not dispute that Marx's actions were ratified by former Fairfield County Prosecutor Landefeld. (ECF No. 24 at 15).[3]

---

[2] That a complaint contains alternative theories of liability that are internally inconsistent does not, by itself, render the complaint subject to dismissal. *See, e.g.*, *Prince v. Hicks*, 198 F.3d 607, 613 (6th Cir. 1999) (upholding the district court's decision to deny Hicks absolute immunity, based on complaint with alternative theories of unconstitutional conduct that were mutually exclusive).

[3] As this Court finds that Plaintiff's claim of *Monell* liability survives Fairfield County's Motion to Dismiss on the grounds that Marx's actions were ratified by a final decision-maker, this Court does not reach Plaintiff's alternative theories of *Monell* liability.

Because Plaintiff has pled specific facts that Defendant Marx's alleged *Brady* violations were ratified by a final decision-maker, Defendant Fairfield County's Motion to Dismiss is **DENIED**.

## IV.    CONCLUSION

For the reasons discussed above, the Fairfield County Defendants' Motion to Dismiss (ECF No. 24) is **GRANTED IN PART and DENIED IN PART**.  Plaintiff's claims against Defendant Marx in his official and individual capacities (Counts 2, 5, 6) are **DISMISSED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  November 10, 2022**

16