**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **RALPH BLAINE SMITH,** | : |
| | : |
| | :   **Case No. 22-cv-00045** |
| **Plaintiff,** | : |
| | :   **Chief Judge Algenon L. Marbley** |
| **v.** | : |
| | :   **Magistrate Judge Kimberly A. Jolson** |
| | : |
| **DAVID SILVERNAIL,** *et al.*, | : |
| | : |
| **Defendants.** | : |
| | : |

<u>**OPINION & ORDER**</u>

This matter comes before this Court on Plaintiff's Motion for Partial Summary Judgment (ECF No. 49), Defendants David Silvernail's and City of Pickerington's Motion for Summary Judgment (ECF No. 100), Plaintiff's Motion for Leave to File Surreply (ECF No. 118), and Defendant Fairfield County, Ohio's Motion for Summary Judgment (ECF No. 101). All motions have been fully briefed and are ripe for consideration. For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment is **DENIED** (ECF No. 49), and Defendants' Motions for Summary Judgment are **GRANTED** (ECF Nos. 100, 101).

## I.     BACKGROUND

### A.     Factual Background

Following a jury trial in August 2000, Plaintiff Ralph Blaine Smith was convicted of two counts of aggravated burglary, three counts of aggravated robbery, two counts of kidnapping, and one count of theft. (ECF No. 99-9). The trial court sentenced him to an aggregate term of 67 years. (ECF No. 100-10 at 5). After 21 years of incarceration and a series of unsuccessful challenges to his conviction, Plaintiff eventually prevailed on a motion for new trial based on the

1

prosecutor, Gregg Marx's ("Marx"), failure to disclose several pieces of material exculpatory evidence. (*See* ECF No. 106-3 at 64-97). Now, Plaintiff brings this suit against the lead detective, the prosecutor, and their municipal employers, seeking redress for the misconduct that led to his wrongful imprisonment.

### 1. Evidence at Trial

In February 2000, Rudy and Trisha Stefanitsis lived in a suburban home in Pickerington, Ohio with their three young children. (ECF No. 100-5 at 393-394). One evening, the Stefanitsises were playing with their children in the basement when Rudy answered a knock at the front door. (*Id.* at 395). Two Black males pushed through the front door and into the home, brandishing guns. (*Id.*) The intruders' faces were partially covered and although the Stefanitsises did not recognize either of the intruders, they demanded to be taken to the safe that the family kept in the basement. (*Id.* at 396). During the ordeal, one of the intruder's masks slipped down on several occasions, briefly revealing his face. (*Id.* at 397-398 (Rudy), 499-501 (Trisha)). After Rudy opened the safe, the intruders retrieved valuable comic books and approximately $10,000 in cash. (*Id.* at 405-06). They also took jewelry from both the Stefanitsises and from their upstairs bedroom, in addition to $400 cash from Rudy's wallet. (*Id.* at 403-07). Finally, the intruders tied Rudy and Trisha up with electrical tape, disconnected the family's phone, and left. (*Id.* at 34; 38). Trisha freed herself from the electrical tape, freed Rudy, and the couple and their children drove to Rudy's brother's house to call the police. (*Id.* at 41-42).

After Det. Silvernail was assigned to the case, he focused his search for potential suspects on Rudy and Trisha's eyewitness descriptions. Eventually, an acquaintance of the Stefanitsises informed Rudy that Plaintiff might have been involved in the robbery. (ECF No. 100-3 at 58-59; 75). Rudy relayed this information to Det. Silvernail (*id.*), who assembled a photo array that

included Plaintiff's photo and proceeded to conduct independent identifications with Rudy and

Trisha. Rudy identified the photo of Plaintiff as one of the intruders.[1]  (*Id.* at 61-62).  During

Trisha's photo array, Det. Silvernail obliged her request to cut out small paper triangles and place

one over the head of each person in the array to mimic the hat the intruder was wearing.  (*Id.* at

65).  She then identified Plaintiff as one of the intruders.  (*Id.* at 66).  Nonetheless, both Trisha and

Rudy requested an opportunity to view him in person to be sure.  (*Id.* at 68).  Det. Silvernail also

interviewed Plaintiff, who denied any involvement and similarly requested that the Stefanitsises

see him in person.  (*Id.* at 73).  At trial, Plaintiff did not testify or call any witnesses.

### 2.  Evidence Revealed After Trial

Since trial, however, more evidence has come to light.  Once Rudy called the police to report

the home invasion, two Pickerington officers responded to the then-unoccupied house.  (ECF No.

106-1 at 10).  Their impressions are memorialized in Officer Annis's narrative summary (*id.*) and

some are recounted in Det. Silvernail's investigative summary, both of which the state trial court

concluded were not turned over to the defense at trial.  (*See* ECF No. 106-3 at 64-97).  Officer

Annis's summary suggests that the officers who reported to the scene were suspicious that an

intrusion occurred in the way that the Stefanitsises relayed.[2]  Specifically, the officers observed

that: (1) despite fresh snowfall, no footprints or tire tracks were present outside the home; (2) there

was only "<u>slight</u>" damage to the door jamb; (3) the house "did not appear to be ransacked"; (4)

---

[1] Plaintiff notes that Rudy appears to have signed his name, indicating identification of the suspect, *under* a photo that is not of Plaintiff, but *above* a photo that is of Plaintiff.  (*See* ECF No. 88-2 at 30).  The layout of the photo array suggests that the appropriate place to sign is *under* the photo of the person identified, but Det. Silvernail explained under oath that Rudy simply misunderstood where to sign to indicate identification of Plaintiff.  (*See* ECF No. 89 at 119-20).

[2] At his deposition, Officer Annis suggested that he thought his written comments reflected his impression at the time that the house was specifically targeted, not selected at random.  (ECF No. 84 at 45).

"the house was gone through <u>too</u> selectively for my taste"; and (5) "the 'subject(s)' forcing entry into the house would have to have been familiar with the victims." (ECF No. 106-1 at 10). Det. Silvernail's investigative summary also included a note that "Trisha seemed to be relaying a story than recalling from memory." (ECF No. 89-1 at 6). In that same vein, the investigative summary also included reports of interviews with four sets of the Stefanitsises' neighbors, none of whom reported seeing or hearing anything unusual that evening, even though two of them reported either leaving or arriving at their homes in the time frame where the robbery reportedly occurred. (ECF No. 106-1 at 11-21).

Additionally, interviews with Rudy and Trisha that the state court concluded were withheld contained information that tended to suggest other potential perpetrators or investigative leads. In an interview with Det. Silvernail two days after the incident, Rudy explained that "I know for sure that [another individual] has something to do with it. I guarantee a hundred percent." (ECF No. 106-1 at 137). Both Trisha and Rudy also identified as an object of suspicion a black Geo Tracker vehicle with green lettering driven by two black males that appeared at their house on the morning of the robbery. (ECF No. 106-1 at 4, 76). At Det. Silvernail's request, the Stefanitsises each provided a list of people who knew about the existence of the safe in their basement, but those lists were not shared with the defense at trial. (*Id.* at 14-16).

Other materials also contained evidence that may have impeached Trisha and Rudy's reliability as eyewitnesses. For example, in a recorded telephone call with Rudy a few weeks after the incident, Rudy expresses doubt to Det. Silvernail that Plaintiff was involved in the robbery. (ECF No. 106-2 at 27). Rudy explains his view that it "doesn't make sense" to him that Plaintiff was one of the intruders, and Det. Silvernail says "my understanding is you're 100 percent sure that that was him in the . . . picture." Rudy responds "[r]ight," but then equivocates saying "out

of them pictures that I seen that you had . . . on there . . . he's the only one that looks like that guy there." (*Id.* at 28). In Trisha's recorded interview with Det. Silvernail the day after the robbery she struggled to remember details, explaining that she "couldn't tell [him] nothing about" the intruder whose face covering kept slipping down. (ECF No. 106-1 at 55). Throughout, she struggled to differentiate between the two robbers explaining that she was "getting everything mixed up." (*Id.* at 52). Again, the state trial court concluded after the fact that the prosecution withheld all of this from Plaintiff's defense team at trial.

### B.    Procedural Background

After 21 years of incarceration and a series of unsuccessful challenges to his conviction, Plaintiff eventually prevailed on a motion for new trial based on Marx's failure to disclose several pieces of material exculpatory evidence. (*See* ECF No. 106-3 at 64-97). Subsequent to the state trial court's new trial order, the government elected to file a motion of *nolle prosequi* abandoning prosecution. (ECF No. 109-3 at 138-40). Plaintiff has subsequently been declared "wrongfully imprisoned" by the State of Ohio. (ECF No. 106-3 at 163-64).

Plaintiff filed the complaint in this action on January 2022. (ECF No. 1). In response, Defendants Fairfield County and Marx submitted a Motion to Dismiss (ECF No. 9), which was denied as moot (ECF No. 20) after Plaintiff filed an Amended Complaint (ECF No. 15). Defendants Fairfield County and Marx then renewed their Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 24), which this Court granted in part and denied in part (ECF No. 54). Specifically, this Court dismissed both the official and individual capacity claims against Defendant Marx in light of the doctrine of absolute prosecutorial immunity, but allowed the claim against Fairfield County to proceed, concluding that Plaintiff had pled sufficient facts related to municipal liability. (*Id.* at 15-16).

Plaintiff then submitted a Motion for Partial Summary Judgment, asking this Court to find that Marx was not entitled to absolute prosecutorial immunity, and that Fairfield was not entitled to various immunity defenses that it raised in its earlier Motion to Dismiss. (ECF No. 49). Defendants Fairfield and Marx moved this Court to strike Plaintiff's Motion as moot based on this Court's earlier Order discussing the issues raised therein, or as premature. (ECF No. 56). This Court granted in part and denied in part Defendant's Motion to Strike Plaintiff's Motion for Partial Summary Judgment, concluding that the portions of Plaintiff's Motion relating to municipal liability would remain on the docket, but the portions relating to absolute immunity would be stricken. (ECF No. 77 at 5).

Following discovery, Defendants Silvernail and Pickerington moved for summary judgment (ECF No. 100), as did Defendant Fairfield County (ECF No. 101). Fairfield's Motion for Summary Judgment also provided a timely response to the *Monell* portion of Plaintiff's Motion for Partial Summary Judgment. (*Id.*) After briefing was complete on both of Defendants' Motions, Plaintiff filed a Motion to File Surreply in Response to Defendants Silvernail and Pickerington's Reply. (ECF No. 118). That Motion to File Surreply has now also been fully briefed by the parties, and all motions are now ripe for consideration.

## II. STANDARD OF REVIEW

This court may grant summary judgment under Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When there are inferences that can be drawn from the record, they "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)

6

The standard of review does not change when the parties file cross-motions, as they have here on a limited basis.  *Cf. Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) ("[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions.").  In other words, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Taft*, 929 F.2d 240, 248 (quoting *Home for Crippled Children v. Prudential Ins. Co.*, 590 F.Supp. 1490, 1495 (W.D.Pa. 1984)).  Simply put, the standard of review on cross-motions is the same as the standard for unilateral summary judgment motions.

### III.    LAW & ANALYSIS

### A.  Detective Silvernail[3]

This Court turns first to consider the claims alleged against Det. Silvernail, before analyzing the municipal liability claims against Pickerington and Fairfield.

### *1. False Arrest*

In order to succeed on a false arrest claim under § 1983, Plaintiff must prove that the arresting officer lacked probable cause for the complained of arrest.  *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005).  In considering whether there was probable cause for a plaintiff's prosecution, courts "consider the totality of the circumstances and whether the facts and circumstances of which [the officer] had knowledge at the moment of the arrest were sufficient to warrant a prudent person in believing that the seized individual had committed an offense."  *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010) (cleaned up).  The existence of

---

[3] Plaintiff also brings a claim against Det. Silvernail for "wrongful conviction" under § 1983.  This Court is not aware of a freestanding § 1983 cause of action for "wrongful conviction," and Plaintiff fails to connect it to a specific constitutional provision.

probable cause in a § 1983 action is usually one for the jury, unless there is only one reasonable determination possible. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

Generally, however, "an arrest based on a facially valid warrant approved by a magistrate provides a complete defense" to a claim of false arrest or imprisonment. *Voyticky.* 412 F.3d at 677. As a result, this Court is not free simply to weigh the facts available to Det. Silvernail at the time of Plaintiff's arrest and decide whether a reasonable jury could conclude there was no probable cause. In a circumstance such as this, where the arrest was based on a facially valid warrant, Plaintiff must show that "in order to procure the warrant, [the police officer] 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Sykes*, 625 F.3d at 305 (quoting *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (internal quotation marks omitted)). Those misdeeds cannot consist solely of testimony, though, because all lay witnesses—including officers—enjoy absolute immunity from civil liability for false testimony. *Briscoe v. LaHue,* 460 U.S. 325, 329-31 (1983); *see also King v. Harwood*, 852 F.3d 568, 587-88 (6th Cir. 2017) (applying absolute testimonial immunity doctrine to a presumption of probable cause in a § 1983 action and concluding that the plaintiff could only rely on an officer's non-testimonial acts).

Instead of focusing on rebutting the presumption of validity by pointing to examples of Det. Silvernail's non-testimonial material dishonesty or omission, Plaintiff focuses on relitigating whether probable cause in fact existed. (ECF No. 106 at 29-33). Construing Plaintiff's arguments liberally, he identifies one purportedly false statement: that "Silvernail wrote the false entry in his Investigative Summary that the Stefanitsises 'immediately' identified plaintiff during the photo array (Ex. C), and provided that document to Marx." (ECF No. 106 at 34). But as Defendants

persuasively respond, Det. Silvernail did not write that both Trisha and Rudy "immediately identified" the Plaintiff. Upon review of the Investigative Summary, Det. Silvernail unambiguously writes that only Rudy "immediately identified" Plaintiff; Det. Silvernail explains that Trisha first requested that he place small paper hats on each photo in the array. (ECF No. 106-1 at 18).[4]

Even if Plaintiff could show that Det. Silvernail made materially false statements or omissions outside of the grand-jury context, he also has not shown that there was an absence of probable cause for his arrest. It bears mentioning at the outset that probable cause is a relatively low bar: "Probable cause exists where the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1508 (6th Cir.1988). Even a single eyewitness identification can support probable cause, "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Id. Legenzoff v. Steckel*, 564 F. App'x 136, 142 (6th Cir. 2014).

To summarize the inculpatory evidence, an acquaintance of the Stefanitsises suggested to Rudy that Plaintiff was involved in the robbery. (ECF No. 89-1 at 7). Rudy passed this information along to Det. Silvernail, who then created a photo array of six photographs, including

---

[4] Plaintiff also calls into question the integrity of the photo array procedure that Det. Silvernail used when the Stefanitsises identified a photo of Plaintiff as looking like one of the intruders. The state trial court, however, considered the validity of the array procedure in a motion to suppress hearing prior to the trial (*see* ECF No. 99-2) and concluded that it was conducted properly based on testimony from Det. Silvernail and the Stefanitsises (ECF No. 99-3). In consideration of the testimony provided, this Court finds Plaintiffs arguments unavailing.

one of Plaintiff.  (*Id.*).  Silvernail had Rudy and Trisha view the array independently, without allowing them time to confer.  (ECF No 89 at 109).  Rudy selected the photo of Plaintiff, (ECF No. 88 at 77; ECF No. 88-2 at 30), as did Trisha, after she requested that Det. Silvernail place triangles of paper on each photograph to simulate the appearance of the hat the intruder was wearing.  (ECF No. 89 at 116-18).  In essence, the evidence in support of probable cause was a tip from an acquaintance of the Stefanitsises, and their subsequent independent photo array identifications of Plaintiff.

Turning to exculpatory evidence, Plaintiff points out that: (1) there were no corroborating witnesses, including the neighbors who neither heard nor saw anything; (2) responding officers noted obvious skepticism that the intrusion occurred as the Stefanitsises described it (or at all), specifically because there were no footprints or tire tracks in the fresh snow at the house and the house was searched "<u>too selectively</u>" for their tastes; (3) Silvernail noted that Trisha appeared to be reciting a story rather than from memory; (4) the Stefanitsises initially struggled to describe the intruders, and provided descriptions that contradicted one another; and (5) Rudy equivocated on the phone with Det. Silvernail after his photo array identification.  (*See* ECF No. 106-3 at 64-97). Although the state court ultimately granted Plaintiff's motion for a new trial because much of this evidence was not turned over to the defense, it noted that it felt the materiality of this evidence to Plaintiff's trial was "an *extremely* close call."  (*Id.* at 86).

The existence of probable cause is also close call—the evidence above could have given Det. Silvernail reason to believe the witnesses were being dishonest or unreliable.  But the existence of some circumstantial exculpatory evidence does not *necessarily* defeat probable

cause.[5]  And since Plaintiff did not produce evidence of material falsehoods to overcome the presumption generated by the valid warrant, his false arrest claim against Det. Silvernail must fail.

### 2. Malicious Prosecution

The analysis of Plaintiff's malicious prosecution claim follows a similar trajectory.  To succeed on a malicious prosecution claim in violation of the Fourth Amendment, Plaintiff must prove that: "(1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015).

Much like the "valid warrant" presumption, for purposes of the second prong of the malicious prosecution test, a grand jury indictment generally gives rise to a rebuttable presumption that probable cause existed.  *King*, 852 F.3d at 586-88.  A plaintiff can rebut that presumption by showing that the officer knowingly or recklessly made false statements, misleading omissions, or fabricated evidence "in the course of setting a prosecution in motion." *Id.* at 587.  Again, the evidence of malfeasance cannot simply be grand-jury testimony because lay witnesses enjoy absolute immunity from civil liability for their testimony.  *Briscoe,* 460 U.S. at 329-31; *see also King*, 852 F.3d at 587-88.  In other words, "pre-indictment nontestimonial acts that were material to the prosecution of a plaintiff [can] rebut the presumption of probable cause established by a grand-jury indictment." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017).

---

[5] Because the existence of probable cause is not essential to the resolution of this case, this Court declines to conclusively determine whether a reasonable jury could conclude that there was probable cause on these facts.

As above, Plaintiff has not provided sufficient evidence of nontestimonial misfeasance to allow a reasonable jury to conclude that Plaintiff has overcome the presumption of probable cause created by the indictment. Accordingly, Plaintiff's malicious prosecution cannot survive summary judgment and this Court need not reach the parties' arguments pertaining to the first prong— whether Det. Silvernail influenced or participated in the decision to prosecute.

### 3. Concomitant and Derivative Disclosure Violations

The Supreme Court held in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). While Prosecutor Marx bore "primary responsibility for carrying out the state's actual 'disclosure' obligations under *Brady*," Detective Silvernail bore "an equally important '*Brady*-derived' responsibility to turn over potentially exculpatory evidence to the prosecutor's office." *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009).

Here, Det. Silvernail contends that he fulfilled this obligation by providing his entire investigative file to Prosecutor Marx, including the four items of exculpatory evidence that the state trial court determined should have been turned over to Plaintiff's counsel during trial. (*See* ECF No. 100 at 23). Det. Silvernail points to his own deposition testimony, in addition to that of Martin Yant ("Yant"), Plaintiff's own investigator, who testified that Marx's case file contained all the documents in the file maintained by Pickerington Police Department. (ECF No. 86 at 19-20; ECF No. 90 at 44-45).

In response, Plaintiff concedes that his discovery efforts have not yielded evidence that Det. Silvernail withheld the four pieces of *Brady* evidence from Marx. (ECF No. 106 at 2). Based on this concession, Det. Silvernail asserts that Plaintiff has abandoned his *Brady*-derived claims

against him.  (ECF No. 115 at 1).  In part to contest this assertion, Plaintiff filed a Motion for

Leave to File Surreply and a Surreply in which he argues that he does not abandon his claim and

is simply noting movant's failure to disclose any record indicating that the relevant pieces of

evidence were in fact turned over.  (ECF No. 118-1 at 1-4).  This Court **GRANTS** Plaintiff's

Motion to File Surreply (ECF No. 188-1) to consider this point only, as it is the only one of the

three made in the surreply that responds to a new argument.  *See NOCO Co. v. Shenzhen Valuelink*

*E-Com. Co.*, 550 F. Supp. 3d 488, 499 (N.D. Ohio 2021) (noting that surreplies are disfavored but

may be allowed "when new submissions and/or arguments are included in a reply brief, and a

nonmovant's ability to respond to the new evidence has been vitiated.") (quoting *Seay v. Tenn.*

*Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)).

In Plaintiff's Surreply, he recites portions of *Jackson v. City of Cleveland*, 925 F.3d 793

(6th Cir. 2019) at length, seemingly to highlight the emphasis the Sixth Circuit placed on the

summary judgment standard: that the plaintiffs need only show that a "reasonable jury" could

conclude that the officers violated the law.  (ECF No. 118-1 at 2-4).  But beside *Jackson*'s

adherence to the uncontroversial summary judgment standard, and the fact that the officers there

were also accused of *Brady* violations, *Jackson* is not on point here.  There was no debate in

*Jackson* that the officer failed to turn over the evidence to the prosecutor; the genuine issue of

material fact there was whether the officer was aware of the evidence at all.  *Jackson*, 925 F.3d at

815 (concluding that since the officer "did not disclose any of this evidence prosecutors, a

reasonable jury could find that [the officer] suppressed exculpatory evidence in violation of

*Brady*.").  As a result, the attempted analogy is unilluminating.

In the present case, the absence of a record memorializing the handover of an investigative

file in 2000 does not give rise to a genuine issue of material fact.  Det. Silvernail, Marx, and Yant

all provided sworn testimony that Marx possessed the entire investigative file prior to trial. (ECF No. 85 at PageID 1457; ECF No. 86 at PageID 1643-44, 1678-79; ECF No. 90 at PageID 2194-95). Plaintiff has failed to present any non-speculative basis on which a reasonable jury could conclude otherwise.

### 4. Civil Conspiracy

#### a. Conspiracy under § 1983

Plaintiff alleges that Silvernail and Marx conspired to prosecute him without probable cause in violation of § 1983.

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). Although "circumstantial evidence of an agreement among all conspirators may provide adequate proof of a conspiracy," "vague and conclusory allegations unsupported by material facts are not sufficient to state a claim." *Hamilton v. City of Romulus*, 409 F. App'x 826, 836-37 (6th Cir. 2010).

Det. Silvernail argues that Plaintiff's conspiracy claim fails first and foremost because there is no evidence of an agreement or conspiracy between him and Marx. (ECF No. 100 at 30-31). Plaintiff points to two facts that he claims are evidence of a conspiratorial agreement. First, Plaintiff argues that because Marx wrote the criminal complaint that Det. Silvernail filed to initiate Plaintiff's prosecution, that the two must have shared a single plan to prosecute and convict Plaintiff without probable cause. (ECF No. 106 at 38). The second fact that Plaintiff argues

smacks of conspiracy is that Det. Silvernail and Marx visited the Stefanitsises together at their home prior to filing charges against Plaintiff. (*Id.*)

Neither argument relies on anything but speculation. That Det. Silvernail filed a criminal complaint authored by a county prosecutor with whom he worked does not create a genuine issue of material fact with respect to the existence of an illegal conspiracy. Nor does a home visit to two victims of a crime on which both Det. Silvernail and Marx were working. Surely, "there has to be more evidence than the police officers [and prosecutor] were doing their jobs to find that they formed a conspiracy." *Gregory v. City of Louisville*, Case No. 3:01-CV-535 (W.D. Ky. Mar. 29, 2004).

### b. *Conspiracy under § 1985(3)*

Plaintiff also alleges that Silvernail and Marx conspired against him to deprive him of equal protection of the laws under 42 U.S.C. § 1985(3). To maintain a claim under § 1985(3), a plaintiff must establish:

> (1) a conspiracy involving two or more persons[;] (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws[;] and (3) an act in furtherance of the conspiracy[;] (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.

*Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994). The plaintiff must also "demonstrate that the conspiracy was motivated by a class based animus, such as race." *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998).

Even if there was evidence of an agreement, Plaintiff has also failed to produce any evidence that Silvernail's conduct was motivated by class-based animus. Plaintiff makes the perplexing choice to include data in his briefing regarding the racial makeup of the relevant geographic area and racial disparities in incarceration but fails to connect this broad data to the set

15

of facts surrounding Plaintiff's wrongful conviction.  (ECF No. 106 at 12-13).  As a result, Plaintiff's claim under § 1985(3) cannot survive summary judgment.

Given that this Court concludes that none of Plaintiff's claims against Det. Silvernail survive summary judgment, this Court need not consider whether Det. Silvernail is entitled to qualified immunity.

## B.  City of Pickerington, Ohio

Plaintiff also brings a *Monell* municipal liability claim against the City of Pickerington, Det. Silvernail's employer, for Det. Silvernail's role in Plaintiff's prosecution.  (ECF No. 15 at ¶¶ 90-98).  A finding of *Monell* liability against the City of Pickerington in this case would require an underlying constitutional violation by the municipality's employee, Det. Silvernail.  Having concluded above that none of Plaintiff's claims against Det. Silvernail survives summary judgment, Plaintiff's claims against Pickerington must also fail.

## C.  Fairfield County, Ohio

Because this Court dismissed Plaintiff's claims against Marx in light of the—admittedly troubling—doctrine of absolute prosecutorial immunity, only Plaintiff's municipal liability claims against Marx's employer, Fairfield County, remain.  As a threshold matter, this Court clarifies the claims that remain viable against Fairfield.  Plaintiff suggests in his response to Fairfield's summary judgment motion that perhaps the official capacity claims against Marx remain.  But Fairfield is correct that this Court explicitly dismissed both the individual and official capacity claims against Marx.  (ECF No. 54 at 16).

Additionally, Fairfield is under the impression that Plaintiff's *Monell* claim against it is limited to claims for Marx's *Brady* violations and conspiring to fabricate and elicit perjured testimony, and for a policy of inadequate training of prosecutors.  A careful examination of

16

Plaintiff's Eighth Cause of Action, however, reveals that Plaintiff also alleges that Fairfield is liable for Marx's malicious prosecution and false imprisonment of Plaintiff. (ECF No. 15 at 22 ¶ 106).

As above, Fairfield is only liable if Plaintiff can establish that there is a genuine issue of material fact regarding whether Marx committed an underlying constitutional violation. This Court considers that question before turning to whether Plaintiff has shown a genuine issue of material fact with respect to Fairfield's municipal liability under *Monell*.

### 1. Malicious Prosecution and False Imprisonment

In light of this Court's analysis above regarding probable cause, Plaintiff's claims against Marx for malicious prosecution and false imprisonment can be disposed of with dispatch. Plaintiff would need to overcome a presumption of probable cause for each claim by showing that Marx provided material falsehoods, material omissions, or fabricated evidence. Absent any evidence of affirmative misrepresentations, this Court pauses only to note that any omissions during Marx's presentation to the grand jury are insufficient to overcome the presumption created by the indictment because "the government . . . has no judicially enforceable duty to provide a grand jury with exculpatory evidence." *United States v. Angel*, 355 F.3d 462, 475 (6th Cir. 2004). In sum, Plaintiff has not overcome the presumption of probable cause created by the valid warrant or the grand jury indictment, and therefore, there was no underlying malicious prosecution or false imprisonment for which Fairfield can be held liable.

### 2. Conspiracy

Plaintiff's allegations that Marx and Det. Silvernail conspired in violation of § 1983 meet the same fate as they did with respect to Det. Silvernail: Plaintiff has presented no evidence of an agreement aside from the fact that Det. Silvernail and Marx performed their respective roles during

the same prosecution, and Plaintiff has also failed to present any evidence of class-based discrimination necessary to support a § 1985(3) claim. Neither claim survives summary judgment.

### 3. Brady *Violations*

Before turning to the question of municipal liability with respect to the failure to disclose material exculpatory evidence, Fairfield argues in its Motion that the record does not support the existence of an underlying *Brady* violation. As mentioned above, a *Brady* violation occurs when prosecutors fail to turn over favorable evidence to the accused and that evidence is material either to guilt or punishment. *Robertson v. Lucas*, 753 F.3d 606, 619 (6th Cir. 2014). Such wrongful withholding violates the accused's due process rights. *Id.*

It is irrefutable that the state trial court granted Plaintiff a new trial because it concluded that Marx violated *Brady* when he failed to turn over several pieces of material evidence to Plaintiff. (*See* ECF No. 106-3 at 64-97). Plaintiff attached the opinion as an exhibit to its Response to Fairfield's Motion. (ECF No. 106-3). In it, the trial court explains that Marx testified at an evidentiary hearing on the new trial motion that he would have turned over all exculpatory evidence, but he did not believe the evidence in question to be exculpatory. (*See* ECF No. 106-3 at 64-97). It is unproblematic for this Court to take judicial notice of the existence of the opinion itself and its effect on Plaintiff's criminal sentence. *See* Fed .R. Evid. 201(b) (a court "may take judicial notice of a fact that is not subject to reasonable dispute . . . ."). This Court can also review the evidence that was the subject of the new trial proceeding, submitted as part of this record, to consider whether it is exculpatory and material.

What is more challenging, however, is Plaintiff's apparent reliance on the state court opinion alone as evidence that Marx failed to turn the documents over to the defense. Generally, courts "cannot take notice of findings of fact [in opinions] from other proceedings for the truth of

the matter asserted therein because these findings are disputable, and usually are disputed." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 n.6 (7th Cir. 1997) (collecting cases). A better option would have been sworn testimony from another proceeding, which is admissible on a motion for summary judgment as it "serves the same purpose as an affidavit under Fed. R. Civ. P. 56." *Hicks v. Barberton Police Dep't*, No. 5:1-cv-76, 2012 WL 5833565, at *1 (N.D. Ohio Nov. 15, 2012). But Plaintiff has failed to include Marx's testimony from that proceeding as an exhibit in these proceedings. To make matters worse, Fairfield points out that during Plaintiff's counsel's deposition of Marx, counsel did not elicit any testimony whatsoever regarding Marx's failure to turn over the material in question.

In response, Plaintiff contends without citation that the doctrine of issue preclusion applies because the state court's opinion already determined that there was a *Brady* violation (ECF No. 109 at 36). Defendant retorts, also without citation, that the doctrine of issue preclusion does not absolve Plaintiff of his summary judgment burden. (ECF No. 117 at 17).

With that framework in mind—and without the relevant transcript—this Court is left to consider whether the state court's conclusion that Marx failed to turn over evidence is an adjudicative fact of which it cannot take notice, or if the state court's conclusion that there was a *Brady* violation has preclusive effect. In *Godboldo v. Cnty. of Wayne*, the Sixth Circuit considered a § 1983 claim brought by a mother and daughter, alleging that a government social worker had violated their Fourth Amendment right to be free from unreasonable searches and seizures when she filed a petition to remove the child from her mother's custody. 686 F. App'x 335, 337 (6th Cir. 2017). The district court denied the social worker's motion to dismiss on the claim and the social worker appealed, arguing that the court should take notice of the attached state court opinions that found there was probable cause to take the minor into protective custody. *Id.* at 339-

40.  The Sixth Circuit sided with the social worker, explaining that she was not asking them "to take judicial notice of adjudicative facts, as contemplated by Federal Rule of Evidence 201" but instead, seeking "to enforce the decisions of two dispositive [] state court opinions, as they directly relate to the § 1983 action filed against her."  *Id.* at 340.  The court went on to apply state law to determine whether the plaintiffs in that case were collaterally estopped from contending that there was no probable cause.  *Id.*  This Court will do the same.

Under Ohio state law, a party seeking to assert collateral estoppel must plead and prove the following elements: "(1) The party against whom estoppel is sought was a party or in privity with a party to the prior action; (2) There was a final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue; (3) The issue must have been admitted or actually tried and decided and must be necessary to the final judgment; and (4) The issue must have been identical to the issue involved in the prior suit."  *Balboa Ins. Co. v. S.S.D. Distrib. Sys., Inc.*, 109 Ohio App. 3d 523, 527-28, 672 N.E.2d 718, 721 (1996).  Here, Plaintiff and Fairfield County were in privity in the first action—although the criminal case is styled "*State of Ohio v. Ralph Blaine Smith*," the litigation of the trial and the new trial motion were performed by the Fairfield County Prosecutor's Office.  The order granting a new trial was a decision on the merits regarding Plaintiff's *Brady* claim, and the issue was necessary to the final judgment—it was the only issue for which the court granted relief.  Finally, the existence of a *Brady* claim was the exact issue in the prior case as it is in this one.

As a result of giving the state court opinion preclusive effect, this Court concludes that the parties are "collaterally estopped from re-litigating the existence" of Marx's *Brady* violation. *Godboldo*, 686 F. App'x 335, 337 (6th Cir. 2017).[6]

### 4. Monell *Liability*

A plaintiff may hold a municipality liable under § 1983 for the constitutional violations of its employees when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 90 (1978).  It is important to stress that municipal liability is not *respondeat superior* liability; Plaintiff must instead show that the Fairfield's own actions subjected him to a deprivation of rights in violation of *Brady*.  *Id.* at 692.

The Sixth Circuit has explained that there are four general ways to show *Monell* liability. Plaintiff must show either: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Predictably, Plaintiff contends that there is a genuine issue of material fact as to each of these options, whereas Fairfield contends that there is no issue of fact as to any of them.

With respect to the first way to show *Monell* liability, Plaintiff argues Marx was the final policymaker for purposes of Plaintiff's prosecution, and therefore, that his actions constituted official policy.  This theory is the one he presses in his Motion for Partial Summary Judgment. (ECF No. 49 at 24).  It is true that a single decision by a county policymaker can show the existence

---

[6] Nonetheless, Plaintiff's counsel is cautioned that it is best practice to ensure that the facts in evidence support the elements of its claims.

of a county policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-84 (1986). But Plaintiff repeatedly conflates Marx's admitted role as the "chief decision-maker" for Plaintiff's prosecution (ECF No. 85 at 145) with the *Monell* requirement that he be a "final policymaker" for the county with respect to policies relevant to Plaintiff's prosecution. Supreme Court precedent is unambiguous that "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish *municipal policy* with respect to the action ordered." *Pembaur*, 475 U.S. at 483. Marx's status as "chief decision-maker" with respect to Plaintiff's particular case does not make him the "final policymaker" for the County with respect to *Brady* issues. That responsibility lay with then-Prosecutor Landefeld, who retained authority to review Marx's decisions should he so choose. An official's policymaking authority is a question of state law, *id.*, and Ohio law confirms that final decision-making authority is vested with county prosecutors, whose assistants, like Marx, serve at their pleasure. *See* Ohio Rev. Code §§ 309.06, 309.08, 309.09. Plaintiff has presented no evidence or persuasive arguments to the contrary. Accordingly, Plaintiff has not met his burden of showing that there is no dispute of material fact, and his Motion for Partial Summary Judgment is **DENIED** (ECF No. 49). Furthermore, with respect to Fairfield's Motion for Summary Judgment, no reasonable jury could find that Marx was the final policymaker for Fairfield in 2000.

With respect to the second path to *Monell* liability, ratification, Plaintiff advances two theories. Neither is availing. First, to the extent that Plaintiff alleges that Marx's actions were ratified by then-Prosecutor Landefeld, Landefeld and Marx authored declarations explaining that Landefeld never ratified any specific decisions made by Marx during Plaintiff's prosecution. (ECF No. 99-10 ¶ 6; ECF No. 99-11 ¶¶ 5-6). Plaintiff has simply failed to provide contrary evidence

that Landefeld ratified Marx's conduct at issue here, or generally ratified a pattern of *Brady* violations.

Second, Plaintiff makes a somewhat creative argument that Marx ratified his own conduct once he became County Prosecutor because he continued to contest Plaintiff's post-conviction motions. (ECF No. 109 at 38-39). But this argument cannot succeed. In order to hold a municipality liable, the municipality's actions—i.e., the ratification—must be the *moving force* behind the violation. *Monell*, 436 U.S. at 694. As Fairfield persuasively argues, Marx's later conduct as County Prosecutor cannot have been the moving force behind his *Brady* violations in 2000. No reasonable jury could conclude that Marx's conduct was ratified by either Landefeld or Marx such that Fairfield is liable.

This Court turns next to the third option: whether Fairfield County failed to train or supervise its employees with regard to the obligation to turn over exculpatory evidence. In order "[t]o succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Generally, plaintiffs show the second prong, deliberate indifference, through "prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess*, 735 F.3d at 478 (cleaned up). Plaintiff has failed to show any pattern of *Brady* violations that put Fairfield on notice of *Brady* abuses. By their very nature, *Brady* violations tend to avoid detection.

A pattern is not the only option, though.  Plaintiffs can, "[i]n a 'narrow range of circumstances,'. . . show that a municipality was deliberately indifferent by 'fail[ing] to equip law enforcement officers with specific tools to handle recurring situations.'"  *Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 287 (6th Cir. 2020).  These sorts of arguments are predicated on the Supreme Court's opinion in *City of Canton v. Harris*, in which the Court explained that "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  489 U.S. at 390.  In other words, "a plaintiff can show deliberate indifference based on 'single-incident liability,'" as opposed to a pattern of violations, "if the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it."  *Ouza*, 969 F.3d at 287.

The Supreme Court in *Connick v. Thompson*, however, precluded plaintiffs from bringing *Brady* claims against municipalities predicated on "single-incident liability." 563 U.S. 51 (2011). Specifically, the Court held that "[a] district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations in "the usual and recurring situations with which [the prosecutors] must deal.  *Id*. at 67 (quoting *Canton*, 489 U.S. at 391).  Thus, bound by higher court precedent, and absent a "specific reason" to put Fairfield on notice, this Court cannot allow Plaintiff's claim against Fairfield to proceed on a failure-to-train theory.

It is only in Justice Ginsburg's dissent that this Court finds company for its view that the *Connick* "majority's suggestion that lawyers did not need *Brady* training because they 'are

24

equipped with the tools to find, interpret, and apply legal principles,' . . . 'blinks reality.'" *Id.* at 107 (Ginsburg, J., dissenting). Scant training and policy guidance at the Fairfield County Prosecutor's Office, coupled with Marx's testimony at Plaintiff's new trial hearing that indicated a fundamental misunderstanding of the purpose of *Brady*, suggest that the *Connick* majority's position was misguided. Specifically, Marx testified that he did not believe the material in question was exculpatory because he thought the officers' skepticism that a crime occurred was perhaps a result of bias against the victims. (*See* ECF No. 106-3 at 85-86). But as the state trial court observed, this indicates a fundamental misunderstanding of the purpose of *Brady* protections, which exist in part to "preserve the criminal trial, *as distinct from the prosecutor's private deliberations*, as the chosen forum for ascertaining the truth about criminal accusations." (*Id.* at 86 (quoting *Kyles v. Whitley*, 514 U.S. 419, 440 (1995) (emphasis added)). Such a misunderstanding harbored by a relatively experienced prosecutor is proof positive that training and the promulgation of policies addressing one of the "most basic safeguards brigading a criminal defendant's fair trial right" are of essential value. *Connick*, 563 U.S., at 105 (Ginsburg, J., dissenting). *Connick*, combined with the doctrine of absolute prosecutorial immunity that foreclosed Plaintiff's ability to bring claims against Marx directly, this Court, yet again, acknowledges the grim reality for plaintiffs seeking redress for constitutionally unsound prosecutions that wreaked unimaginable havoc in their lives. Nonetheless, this Court must abide by the precedential constraints placed on it.

Finally, this Court turns to the fourth way to show *Monell* liability: custom of tolerance. In order to show a custom of municipal tolerance of constitutional violations, Plaintiff must show: "(1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional

conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the 'moving force' or direct causal link in the constitutional deprivation." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Having failed to proffer evidence of a pattern of *Brady* violations, Plaintiff raises a curious argument regarding statistical evidence of Fairfield County's racial makeup in 2000 and the disparate percentage of its incarcerated population that was Black. (ECF No. 109 at 41-42). This Court declines to take the leaps and bounds Plaintiff invites from this data to a conclusion that: (1) Fairfield County prosecutors were regularly convicting Black citizens with the help of illegal *Brady* violations; (2) that Fairfield County knew this and was deliberately indifferent to it; and (3) that Plaintiff's conviction was a part of this pattern. No reasonable jury could conclude that such a custom of tolerance existed based on Plaintiff's evidence.

## IV. CONCLUSION

For the reasons discussed above, Defendants Silvernail and Pickerington's Motion for Summary Judgment (ECF No. 100) is **GRANTED.** Plaintiff's Motion for Partial Summary Judgment against Defendant Fairfield (ECF No. 49) is **DENIED,** Plaintiff's Motion for Leave to File Surreply (ECF No. 118) is **GRANTED,** and Defendant Fairfield's Motion for Summary Judgment (ECF No. 101) is **GRANTED.** All of Plaintiff's claims are **DISMISSED**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  February 16, 2024**

26